

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00255-CR

———————————————

CLINT JEFFERY BOWEN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Court at Law
Hood County, Texas
Trial Court No. 51525

---

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Clint Jeffery Bowen was wearing 52 pieces cut from various dosages of the opiate-based painkiller patch Fentanyl[1] and had taken several other medications prescribed for him after his knee surgery before he drove his car through a stop sign and into a culvert on his way to the emergency room.

Bowen, who was 52 years old at the time of the accident, had a doctorate in electrical engineering, a recently completed doctorate in Christian Counseling Psychology, and two master's degrees, and at the time of the trial, he was interviewing for positions with universities. Earlier during the day of the accident, he had been working on his dissertation and planning a trip to Australia—a gift from his mother— to celebrate his graduation.

Bowen testified that he had had knee surgery two weeks before, and a bad fall in the shower around 3:30 p.m. that day had left him in extreme pain. He called the sheriff's office and the local police department, trying to find a free ride to the emergency room because he did not want to call 911 and pay $2,000 for an ambulance to drive him one block to the hospital when he "still ha[d] . . . about $480,000 in

---

[1]The registered nurse who triaged Bowen at the emergency room, David Sumners, testified that one Fentanyl patch is the normal dose, that the patch is meant to be worn for 72 hours, and that the peak effects are anywhere from 12 to 24 hours.

medical bills."[2]  He did not call his mother, who had picked up his new prescriptions for him a few days before, or anyone else for a ride.

Instead, after his unsuccessful attempt to find a free ride from local law enforcement, Bowen called one of his doctors, who told him to take some additional pain medicine.  He did so, adding several more Fentanyl pieces to the 24 that he was already wearing,[3] in addition to ingesting the new medications that had been prescribed after his surgery:  Temazepan, a benzodiazepine; Sumatriptan Succinate, a painkiller to alleviate the acute pain from surgery and to augment his chronic pain medication; Cyclobenzaprine, a muscle relaxant; and Seroquel.[4]

At 5:54 p.m., Bowen called a pharmacy to ask about potential drug interactions, and the pharmacist advised him to call the emergency room.  At around 8:26 p.m., he

---

[2]Bowen said that the medical bills were "from this accident," but it is unclear from the record whether he was referring to the drug overdose incident, from the knee surgery a couple of weeks before, or from injuries he had sustained a decade before that had resulted in his Fentanyl prescription.

[3]Bowen did not contest that he had been wearing 52 pieces of Fentanyl patches at the time of the accident.  When asked about them, instead of contesting the number, he stated, "They were absolutely pieces of patches" and tried to explain mathematically how that number would be reached.  Bowen also testified that he had, on occasion, used more than 52 pieces at one time.

[4]Bowen had suffered severe neck and spinal damage and traumatic brain injury in 2010.  He had been prescribed Fioricet, a barbiturate, for the traumatic brain injury and a hydrocodone derivative to augment Fentanyl for the spinal injury; he spent around $640 a month on prescriptions.  Sumners testified that when Bowen's stomach was pumped, a high quantity of blue pill fragments were recovered.  Bowen tested positive for barbiturates, benzodiazepine, and opiates at the hospital.

called a friend who lived in Austin, and she told him that she would call 911 and for him to wait outside for the ambulance. Bowen said that he "sat out there without a phone because [he] locked it inside." He did not realize that his friend did not know his address, but when the ambulance did not come for him, he decided to drive himself to the emergency room because he was dying. Of the three routes to the hospital from Bowen's house, he took the one that was least likely to have anyone else on it, even though it was longer. Bowen took a Narcan shot before getting behind the wheel,[5] neither he nor anyone else was injured when he drove off the road, and "[t]here was zero damage" to his car. Bowen spent seven and a half days in a medical coma after he was taken to the hospital.

Bowen was charged with misdemeanor driving while intoxicated and requested a jury instruction on necessity under Texas Penal Code Section 9.22.[6] The trial court denied his request, and the jury deliberated for 21 minutes before finding him guilty. Bowen was sentenced to 6 months' confinement, a $2,000 fine, court costs, and attorney's fees. The trial court suspended the confinement portion of his sentence and placed him on 12 months' community supervision.

---

[5]Narcan is an antidote to opioid overdose. Medical personnel administered two doses of Narcan to Bowen after the accident.

[6]The necessity defense is based on the confession-and-avoidance doctrine, which requires a defendant to admit to both the act or omission and the requisite mental state. *Davis v. State*, 490 S.W.3d 268, 276 (Tex. App.—Fort Worth 2016, pet. ref'd). Bowen admitted to driving while intoxicated, and in response to his counsel's question, "Did you reasonably believe that it was immediately necessary for you to get in your car and drive to avoid imminent harm?" Bowen replied, "Yes."

4

In a single issue, Bowen argues that the trial court erred by denying his request for the necessity instruction.[7]

The offense of driving while intoxicated is a strict liability crime, meaning that it does not require a specific mental state (e.g., intentionally, knowingly, or recklessly intending to operate a motor vehicle while intoxicated), but only that a person on a public roadway voluntarily operated a motor vehicle while intoxicated. *Farmer v. State*, 411 S.W.3d 901, 905 (Tex. Crim. App. 2013). The question before us is whether voluntarily driving while intoxicated can be justified by a self-initiated medical emergency.

Both parties direct us to *Shafer v. State*, in which we held that a DWI defendant who had voluntarily ingested seven or eight alcoholic drinks before driving could not use the defense of necessity—that she drove while intoxicated because she had to find a safe place to pull over and change drivers when she realized she was drunk—because she had placed herself in that situation. 919 S.W.2d 885, 887 (Tex. App.—

---

[7]The Texas Penal Code's necessity instruction provides that conduct is justified if the actor reasonably believes the conduct is immediately necessary to avoid imminent harm; the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear. Tex. Penal Code Ann. § 9.22. The Penal Code defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42); *Harper v. State*, 508 S.W.3d 461, 467 (Tex. App.—Fort Worth 2015, pet. ref'd) (explaining that the necessity defense requires evidence of a reasonable belief of both immediate necessity and imminent harm).

Fort Worth 1996, pet. ref'd) ("[A] person who is responsible for having placed himself in the position from which he attempts to extricate himself by committing a criminal offense is not entitled to a charge authorizing his acquittal of that offense based upon necessity.").

We reasoned in *Shafer* that if trial courts were required to authorize acquittal for defendants who voluntarily place themselves in a position where they must break the law, such motorists would be free to drink large quantities of alcohol shortly before getting behind the wheel and then, without legal consequence, drive whatever "necessary" distance would be required to stop their vehicles only after the alcohol impaired their abilities. *Id.* (observing that under ordinary standards of reasonableness, a person who voluntarily consumes a large quantity of alcohol before operating a motor vehicle should know that it is only a question of when, not if, the alcohol will impair his or her skills). The same reasoning applies here.

Bowen contends that his case is distinguishable because he "discovered the risk to his life only after he had taken the new dangerous medications at the instructions of his physician," unlike the defendant in *Shafer* who should have known that drinking alcohol would catch up with her. He argues that we should treat his case like a defendant who unknowingly possesses a controlled substance and then asserts that a reasonable person at death's door would take the chance of driving while intoxicated to save his life. The State responds that while there is no dispute that at the time of the accident, Bowen was having a life-threatening medical emergency, he "had ample

6

time and legal options prior to that moment to reach medical assistance" when his initial injury occurred five and a half hours before the DWI offense, and he was therefore responsible for placing himself in the dangerous situation from which he then tried to extricate himself.

The record reflects that Bowen *knew* that he possessed controlled substances—he testified during trial about how regulated his access to Fentanyl was[8]—and all of the medications that he voluntarily ingested were prescribed for him. *See, e.g., Farmer,* 411 S.W.3d at 902 (holding DWI defendant was not entitled to an instruction on voluntariness when he mistakenly—but voluntarily—took his prescription sleeping pill before driving). Bowen also testified that he did not want to call an ambulance because of the price tag but did not seek other alternatives or advice until he had already placed himself in imminent harm. Under the circumstances here, Bowen's actions were akin to those of the defendant in *Shafer.* Accordingly, the trial court did

---

[8]Bowen had been taking Fentanyl for a decade and testified about the drug's dangerous nature, describing it as "the very strongest opiate that's prescribable and on the market," and explaining,

> In order to receive your new prescription because of the status of Fentanyl you can't just go and pick it up, you have to hand them one -- what they do is it comes in a box of five and each patch lasts for three days. So each box will carry for 15 days. So I had two boxes for 30 days. And in order to get that new prescription you have to physically have taken your expired, used Fentanyl, tape them to paper and hand them to the pharmacist. You cannot accumulate this drug.

Bowen also said that his doctor had told him to cut his patches into pieces to keep him on an even dose to avoid cyclical highs and lows and withdrawal headaches.

not err by concluding that he was not entitled to an instruction on the necessity defense, and we overrule his sole issue.

Having overruled Bowen's sole issue, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 23, 2020